NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13360

IN THE MATTER OF KRIS C. FOSTER & others.[1]


Suffolk.     April 3, 2023. - August 31, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, & Wendlandt, JJ.


Attorney at Law, Disciplinary proceeding, Suspension, Disbarment, Public reprimand.  Rules of Professional Conduct.


Information filed in the Supreme Judicial Court for the county of Suffolk on September 23, 2022.

The case was reported by Lowy, J.


Joseph M. Makalusky, Assistant Bar Counsel.
Allen N. David (Kristyn K. St. George also present) for Kris C. Foster.
Patrick Hanley (Thomas J. Butters also present) for John C. Verner.
Thomas R. Kiley (Meredith G. Fierro also present) for Anne K. Kaczmarek.


GAZIANO, J.  A prosecutor "may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike

---

[1] Anne K. Kaczmarek and John C. Verner.

hard blows, he is not at liberty to strike foul ones."  Berger
v. United States, 295 U.S. 78, 88 (1935).  In this appeal, we
address disciplinary sanctions imposed by the Board of Bar
Overseers (board) on three assistant attorneys general accused
of crossing that line.

The consolidated bar disciplinary proceedings arise from
the respondents' involvement in the withholding of exculpatory
evidence during the prosecution of a chemist in the State
Laboratory Institute in Amherst (Amherst lab or drug lab), Sonja
Farak, by the Attorney General's office (AGO).  As detailed in
Committee for Pub. Counsel Servs. v. Attorney Gen., 480 Mass.
700, 705-720 (2018), we dismissed with prejudice thousands of
pending drug charges and drug convictions tainted by evidence
tampering at the Amherst lab.  Id. at 725.  This "strong
medicine" was necessary, we stated, to remedy the intentional
and egregious governmental misconduct of Farak and two of the
three respondents, Anne K. Kaczmarek and Kris C. Foster.  Id.

In the wake of the Farak drug lab scandal, bar counsel
filed petitions for discipline with the board charging
Kaczmarek, Foster, and John C. Verner with various violations of
the Massachusetts rules of professional conduct.  The matter was
heard by a special hearing officer (SHO).  The board adopted in
full the extensive factual findings of the SHO.  The board
recommended that Verner, who supervised the Farak prosecution,

be suspended for three months for neglecting his supervisory duties. The board further recommended that Foster, who was responsible for the AGO's response to subpoenas and discovery motions filed by defense counsel, be suspended for one year and one day for her violations that, for the most part, amounted to "gross incompetence" and "reckless lawyering." In so holding, the board rejected bar counsel's argument that Foster engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998).[2] Finally, the board recommended disbarment for Kaczmarek, who, as lead prosecutor in the Farak case, "[bore] the greatest responsibility" and "the greatest culpability." A single justice reserved and reported the matter to the full court.

We adopt, in part, the board's recommendations. The record supports a finding that the prosecutors failed in their collective duty to disclose potentially exculpatory information that was known to the AGO. We also conclude, however, that in certain circumstances, reasonable and good faith reliance on another attorney's representations may be a special mitigating factor. Because Verner reasonably relied in good faith on

---

[2] Because this case concerns misconduct that occurred in 2013, we refer to the rules of professional conduct as they existed at that time. See Matter of Brauer, 452 Mass. 56, 64 n.11 (2008).

Kaczmarek's misrepresentations that she had turned over exculpatory information, and his liability is limited to failing to follow up with her as to whether she had disclosed all such information, we differ with the board and conclude that anything more severe than a public reprimand would be inappropriate. Because Foster was reckless in her representations about what the AGO had disclosed, and otherwise exhibited incompetence in her response to the subpoena and discovery motions, we accept the board's recommendation that she receive a suspension of one year and one day. Finally, because Kaczmarek was most culpable for the AGO's failure to turn over all exculpatory information, and because she displayed a lack of candor and remorse at the disciplinary hearing, we accept the board's recommendation that she be disbarred. The matter is remanded to the county court for entry of final judgment.

1. Background. We summarize the relevant factual findings of the SHO from his detailed ninety-two page hearing report, as adopted by the board, concluding that they are supported by substantial evidence.[3] See S.J.C. Rule 4:01, § 8 (6), as appearing in 453 Mass. 1310 (2009). We supplement the facts

---

[3] We therefore refer to the SHO's factual findings as those of the board. See Matter of Laroche-St. Fleur, 490 Mass. 1020, 1021 n.7 (2022), citing Matter of Eisenhauer, 426 Mass. 448, 449 n.1, cert. denied sub nom. Eisenhauer v. Massachusetts Bar Counsel, 524 U.S. 919 (1998).

with undisputed evidence in the record as needed.  See Matter of Angwafo, 453 Mass. 28, 29 (2009), citing Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).

a.  Arrest and initial investigation of Farak.  From 2004 through 2013, Farak worked as a chemist at the drug lab, located on the campus of the University of Massachusetts in Amherst.  Farak was responsible for analyzing suspected narcotics submitted by law enforcement agencies, issuing drug analysis certificates, and testifying in criminal proceedings regarding her analyses.  On January 17, 2013, another chemist in the Amherst lab noticed that two samples that had been assigned to Farak were missing from the evidence locker.  The next day, Farak's supervisor searched the lab and found the packaging for the two missing samples at Farak's work area.  Farak had identified the samples as cocaine, but subsequent testing of the substances in the packaging showed one sample adulterated with a foreign substance and the other negative for cocaine.

On the next day, January 18, 2013, the State police began a criminal investigation into Farak's potential tampering with drug samples submitted for analysis.  The AGO agreed to undertake the investigation and the potential prosecution of Farak.  In the early morning hours of January 19, 2013, a team of investigators, which included State police Sergeant Joseph Ballou, executed a search warrant on Farak's car.  The search

team catalogued twenty separate items, including several "zip-lock" plastic bags containing capsules, pills, and a white powder, as well as manila envelopes dated as early as 2008 and 2009, and what seemed to be assorted paperwork from the drug lab. When the search was complete, the State troopers secured the evidence in the evidence room at the Springfield State police barracks (Springfield barracks).

Farak was arrested on January 19, 2013, and arraigned three days later, charged with two counts of evidence tampering, and possession of cocaine and heroin. It generally was recognized by the AGO that the Farak case was a matter of high importance.

At the time, Verner was the chief of the AGO's criminal bureau, and between 2012 and 2014, Verner managed more than one hundred people, including about fifty lawyers. Verner assigned Kaczmarek, an assistant attorney general in the enterprise, major, and cyber crimes division (EMC) of the AGO's criminal bureau, as lead prosecutor on the Farak case. Verner chose Kaczmarek in part because she had been assigned to, and was at the time working on, the prosecution of another State drug laboratory chemist who tampered with evidence, Annie Dookhan. See Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 303 (2017). Kaczmarek primarily was responsible for the prosecution of Farak, while Verner was available for support and assistance as needed.

Verner and Kaczmarek understood early in the Farak case, as had been the case in the Dookhan investigation, that defendants with pending cases, as well as those who had been convicted on the basis of Farak's drug analysis, would be entitled to receive from the district attorneys' offices (DAOs) potentially exculpatory information obtained by State police and the AGO in the investigation and prosecution of Farak. Verner and Kaczmarek further understood that any information inculpatory toward Farak potentially would be exculpatory toward those defendants.

Verner adopted the same discovery policy for the Farak case that the AGO had in the Dookhan case. In the Dookhan case, a discovery policy had to be created due to the unprecedented nature of Dookhan's misconduct and the AGO's indirect relationship with affected defendants. Generally, the vast majority of drug cases are prosecuted by the DAOs, so the AGO's connection with those defendants affected by Dookhan's misconduct was through the DAOs. Thus, Verner and his supervisor, First Assistant Attorney General Edward Bedrosian, developed a policy that they would provide "discoverable information . . . [w]hether it was exculpatory or not," obtained by the State police and the AGO to the DAOs, so that the DAOs could provide it to the affected defendants. Verner made it

clear to Kaczmarek that the AGO would adopt the Dookhan protocol in the Farak case.

During the investigation of Farak, Ballou obtained information from a prosecutor in Hampden County regarding two cases in which the drug samples appeared to have been tampered with by Farak. On January 23, 2013, after Ballou informed Kaczmarek, Verner, and his supervisor, Detective Lieutenant Robert Irwin, about the two additional cases, Kaczmarek and Verner each approved and authorized Ballou to obtain additional information about Farak's potential tampering. Kaczmarek wrote in an e-mail message to Verner, Ballou, and Irwin, "I think this is the tip of the iceberg."

On further investigation, Ballou learned about a March 2012 case involving suspected oxycodone pills; in that case, Farak returned more pills than she had received from police, and the pills were different in appearance from those initially submitted to the drug lab. Ballou also learned of a 2005 case in which the amount of cocaine had decreased by four grams between the time it initially was weighed by police and when it was returned by Farak. A prosecutor involved in the 2005 "light" cocaine case told Ballou that he thought the difference in weight could be explained by the weight of the packaging, drying of the product, and inaccuracy in the police scale. In January 2013, Ballou informed Verner and Kaczmarek by e-mail

about the two cases. In response, Kaczmarek wrote, "Please don't let this get more complicated than we thought. If she were suffering from a back injury -- maybe she took some oxys?"

Despite the oxycodone and cocaine cases, Ballou, Verner, and Kaczmarek operated on the theory that Farak's drug use and tampering had been confined to cocaine and only dated back to November or December 2012; they believed the 2005 cocaine case and the 2012 oxycodone case to be "outliers." The board found that the 2012 oxycodone case and the 2005 cocaine case were potentially exculpatory evidence. Verner testified that these cases were "exculpatory information," and the SHO did not credit that Kaczmarek failed to realize that this evidence was potentially exculpatory. While the 2012 oxycodone case was eventually sent to at least one of the DAOs by Ballou, the 2005 cocaine case was not turned over.

At around the same time, Kaczmarek also learned that Farak had tested positive for cocaine on a urinalysis to which she submitted near the time of her arrest, and that Farak had admitted to using cocaine on Friday, January 18, the day before her arrest. Kaczmarek forwarded this information to Verner, Ballou, and Randall Ravitz, the chief of the appeals division of the AGO's criminal bureau. Verner testified that he agreed that the January 2013 urinalysis potentially was exculpatory, but Kaczmarek denied that it was.

By the end of January, Farak's conduct was attracting considerable attention. A colleague sent an e-mail message to Verner and Kaczmarek that the district attorney for the Hampden district "was getting pressure from the judges to identify cases that were handled by Farak."

b. Discovery of mental health worksheets. On February 14, Ballou reviewed the paperwork in the manila envelopes recovered from the search of Farak's car. Ballou realized that papers police originally thought were related to the drug lab actually were personal papers, which included mental health counselling worksheets that detailed Farak's struggles with drug addiction, as well as her failed efforts to resist using drugs at work. Handwritten notes on these papers suggested that Farak's misconduct may have had a longer history than the AGO had realized. Ballou, knowing that Kaczmarek was preparing for a grand jury and recognizing the potentially inculpatory value of the mental health worksheets, telephoned Kaczmarek to tell her about them. During the telephone call, he expressed a concern that the worksheets could be privileged. Kaczmarek said that she would inquire of Verner whether a court order was needed to present them to the grand jury.

That same day, Ballou scanned and attached eleven pages found within Farak's vehicle to an e-mail message with the subject "FARAK Admissions" addressed to Irwin, Kaczmarek, and

Verner.  The first four pages were news articles, dated sometime in 2011, about drug use by law enforcement officers, a pharmacist, and a former technician of a drug laboratory in another State, with what appeared to be Farak's handwritten comments in the margins discussing their drug use.  Ballou included these articles because he believed they indicated that "the case could have gone back much further than the time frame [at which they] had been looking."  In the remaining pages, Farak referenced lying on or about a Drug Enforcement Agency application, having "urge-ful" samples to analyze at work, having urges to use a good sample at work, and knowing there would be periods when she would be alone at work.  One of the pages provided:  "Thursday:  tried to resist using @ work, but ended up failing"; and "Friday:  @ work use w/out debating doing it."

When Kaczmarek received Ballou's e-mail message, she reviewed the pages and researched their contents for about thirty minutes.  Kaczmarek then saved a combined electronic copy of the documents on her computer, titling the file "mental health worksheets."  Kaczmarek also printed copies of each document, placed them in a manila envelope likewise labeled "mental health worksheets," and added the envelope to a box dedicated to Farak's trial.  In a follow-up telephone call with Kaczmarek, Ballou advised her that, because "there were so many

papers and things" seized from Farak's car, she should "come out and look" at everything, not just the eleven pages he had sent to her by e-mail. She never did.

Kaczmarek sought Verner's advice about whether to include the mental health worksheets in her grand jury presentation. She told Verner that there had been documents discovered in Farak's car in which Farak "was talking about how she felt using drugs and it may have been with some form of clinician" but that she had a concern that the documents might be privileged. Verner advised Kaczmarek not to include the mental health worksheets in her grand jury presentation. Kaczmarek told Ballou that she had discussed the issue with Verner and that they had decided not to include the mental health worksheets in the grand jury presentation because they had sufficient evidence without the worksheets.

Before the SHO, Verner testified that he neither had read Ballou's e-mail message nor opened the attachments. The SHO rejected this testimony as not credible and found instead that he had looked at the attachments. The SHO also found that both Kaczmarek and Verner had known the documents Ballou had sent them were exculpatory: "Any prosecutor or criminal defense counsel who spent even a few minutes reviewing the attachments to Ballou's February 14 [e-mail message] would have recognized their significance: highly inculpatory to Farak, and highly

exculpatory to all Farak defendants." The mental health worksheets remained in the evidence room at the Springfield barracks.[4] Copies of the mental health worksheets also were on Kaczmarek's computer, on Verner's computer as an attachment to Ballou's February 14, 2013, e-mail message, and in Kaczmarek's trial box.

c. Prosecution memorandum and grand jury preparation. In late March 2013, Kaczmarek wrote a prosecution memorandum[5] seeking approval from the executive bureau of the AGO to indict Farak. In the section of the memorandum discussing items recovered from Farak's vehicle, Kaczmarek included "mental health worksheets describing how Farak feels when she uses illegal substances and the temptation of working with 'urge-ful samples.'" Her direct supervisor, the chief of the EMC division, Dean Mazzone, reviewed the prosecution memorandum and suggested edits, which Kaczmarek adopted. Before Mazzone signed off on the prosecution memorandum, he and Kaczmarek had a

---

[4] It is unclear whether the mental health worksheets, or photocopies of them, were located in Ballou's investigatory file. Before the SHO, Ballou testified that he did not know whether the mental health worksheets were in his case file. The SHO found that Ballou's file contained his reports, search warrants, returns, and other similar items, but not the actual evidence in the evidence locker in the Springfield barracks.

[5] A prosecution memorandum, or a "pros memo," is an internal memorandum that prosecutors write at the AGO to obtain approval to charge a particular case.

conversation about the mental health worksheets because Kaczmarek was concerned that they possibly were privileged or too prejudicial.  In footnote seven in the memorandum, Kaczmarek described the mental health worksheets:  "These worksheets were not submitted to the grand jury out of an abundance of caution in order to protect possibly privileged information.  Case law suggests, however, that the paperwork is not privileged."

Verner also reviewed Kaczmarek's prosecution memorandum. He signed his approval on March 27, but made significant and substantial comments throughout it, including comments and questions directed specifically to Kaczmarek.  In one instance, Verner made a handwritten notation next to footnote seven, writing as to the mental health worksheets:  "this paperwork NOT turned over to DAs office yet."  Verner "absolutely" understood that these worksheets needed to be turned over to the DAOs.

At the hearing before the SHO, Kaczmarek testified that she never had reviewed a signed, approved prosecution memorandum, and that even if she had seen Verner's note about the mental health worksheets, she would not have interpreted it as an instruction to turn them over to the DAOs.  The SHO did not credit Kaczmarek's testimony, relying on the fact that Kaczmarek had incorporated Verner's comments in another section of the memorandum, and that Kaczmarek not viewing Verner's comments with the purpose of acting on them would have been a knowing

violation of office policy and protocol. The SHO found that Verner had instructed Kaczmarek to turn over the mental health worksheets through the prosecution memorandum and, as was Verner's expectation with every assistant attorney general, he expected Kaczmarek to review this instruction and take the required actions.

In late March 2013, before the grand jury Kaczmarek presented various testimony and exhibits, including the newspaper articles from 2011 that had been found with the mental health worksheets. On April 1, 2013, the grand jury indicted Farak on four counts of tampering with evidence, two counts of unlawful possession of a class B controlled substance, and four counts of theft of a controlled substance from a dispensary.

d. AGO's formal disclosures. At around the same time as the grand jury proceedings, the AGO began receiving discovery requests from the DAOs. While the prosecution memorandum was being edited and finalized, Kaczmarek and Verner discussed the language of a discovery letter to be sent to the DAOs along with documents related to and obtained in the course of the Farak investigation. Verner testified that, as was done in the Dookhan case, the evidence the AGO uncovered "would be turned over by [the AGO] to the individual [DAOs] who would then make the determination on what to do with them." On March 27, 2013, Verner signed the first discovery letter sent to the DAOs, which

Kaczmarek helped draft, and which accompanied 210 pages of potentially exculpatory material, but excluded the mental health worksheets, 2005 cocaine case, 2012 oxycodone case, and Farak's urinalysis.

Kaczmarek also was responsible for providing discovery to Farak's defense attorney, Elaine Pourinski. When Farak was arraigned on April 22, 2013, Kaczmarek provided Pourinski with assorted documents, which included the six pages of mental health worksheets. On May 14, Kaczmarek arranged with Ballou for Pourinski and Farak to review the evidence located in the evidence room at the Springfield barracks. Kaczmarek did not review that evidence herself.

There were two subsequent discovery letters and packages sent to the DAOs on June 26, 2013, and July 12, 2013, signed by Kaczmarek, which Verner did not review, but the second discovery letter was sent to Verner for his approval. Kaczmarek's second and third discovery letters noted the AGO's "continuing obligation to provide potentially exculpatory information to the [d]istrict [a]ttorneys as well as information necessary to your [o]ffices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst lab[]." The second and third disclosures, sent on June 26 and July 12, respectively, included minutes and exhibits from the grand jury, but did not include information about the 2005

cocaine case, the 2012 oxycodone case, the mental health worksheets, or Farak's urinalysis. There were no additional disclosures sent to the DAOs after July 12, 2013.

As of March 27, 2013, Verner knew that the mental health worksheets had not yet been turned over, but understood that his office had an obligation to do so, and reasonably expected that Kaczmarek was going to disclose them, along with all other exculpatory information. Verner never followed up with Kaczmarek to ensure that the mental health worksheets and other information had been disclosed to the DAOs.

e. Defendants' additional discovery requests. As the prosecution of Farak progressed, multiple defendants filed subpoenas and discovery requests for information related to Farak's conduct. The matters were consolidated before Superior Court Judge C. Jeffrey Kinder, who assigned Francis E. Flannery, then first assistant district attorney for the Hampden district, to serve as lead counsel on behalf of the Commonwealth, and attorneys Luke Ryan and Jared Olanoff to serve as lead counsel for the Farak defendants. A hearing was set for September 9, 2013, for the purpose of determining "the timing and scope of . . . Farak's alleged criminal conduct."

Prior to the hearing, Ryan served Kaczmarek and Ballou with subpoenas seeking documents pertaining to the scope of evidence tampering at the Amherst lab in connection with a matter

captioned Commonwealth vs. Penate, Mass. App. Ct., No. 2015-P-0054. At around the same time, the AGO also received other subpoenas and discovery requests for the September 9 hearing, including a discovery motion from Ryan in Commonwealth vs. Rodriguez, Mass. Super. Ct., No. 1079CR01181 (Hampden County 2013), and a subpoena for Ballou from Olanoff in Commonwealth vs. Watt, Mass. Super. Ct., Nos. 0979CR01068 & 0979CR01069 (Hampden County 2013). The discovery motions and subpoena each sought substantially the same documents, such as "all documents and photographs pertaining to the investigation of . . . Farak and the Amherst drug lab[]." In the Rodriguez case, Ryan also filed a motion to inspect the evidence seized from Farak's car that was located at the Springfield barracks. Ballou sent the subpoenas to Verner, Mazzone, Irwin, and Kaczmarek, writing, "Anne asked me to forward this to the group to see if it can be quashed."

On August 23, 2013, Ravitz assigned Foster, who had started in the appeals division of the AGO in July 2013 and had no experience in responding to subpoenas, to serve as the lead attorney representing the AGO in the Superior Court proceedings. A few days later, Ravitz met with Foster to provide her some guidance on the process for responding to subpoenas and a few sample motions. Foster was told not to "reinvent the wheel" and was advised to copy wholesale from the sample motions. The

board noted that, "[g]iven the nature of the Farak prosecution, and the subpoenas' importance both to the Farak case and to the Farak defendants' cases, someone with significant experience with subpoenas should have been assigned."

Under the direction of Susanne Reardon, the deputy chief of the AGO's criminal bureau's appeals division, Foster prepared a motion to quash the subpoena for Ballou in the Watt case. Reardon told Foster to speak with Kaczmarek and Ballou before responding, so that she could determine what had yet to be turned over. Foster did not consult Kaczmarek or Ballou about what had been turned over and proceeded to draft a motion to quash the Watt subpoenas and a memorandum of law in support of the motion. Foster sent Reardon a draft to review, and Reardon provided comments, again noting that it would be "helpful" if Foster verified what had and had not been turned over to defense counsel. Neither Ravitz nor Reardon explicitly instructed Foster to review Ballou's file.

After a meeting with Verner, Mazzone, Kaczmarek, and Reardon, Foster filed a motion to quash the Watt subpoena on September 6. Foster asserted that Ballou had limited first-hand knowledge of the events described in the document requests, some documents were protected by the qualified law enforcement privilege, and Ballou should not be compelled to reveal his thought process or the work product of the AGO. Foster

alternatively asked Judge Kinder to restrict the subpoena's scope and to protect certain categories of information. Foster did not review Ballou's file prior to filing these documents, despite Reardon's suggestion.

Foster also filed an opposition to the discovery motion in the Rodriguez case. She argued that the discovery requests were unreasonably broad and sought documents outside the scope of the issues to be litigated at the hearing on September 9. In response to the motion to inspect the evidence seized from Farak's car, Foster replied that the AGO was taking the position that this would not be possible because the investigation of Farak was ongoing.

At this time, lead counsel for the DAOs, Flannery, was also actively preparing for the September 9 hearing. He reached out to Ballou seeking information about Farak's potential tampering in the 2012 oxycodone case. Ballou prepared and sent a report to Flannery on September 4, including Kaczmarek on the e-mail message, detailing what he knew about the 2012 oxycodone case. Flannery also requested that Ballou set up a date "so a team of defense attorneys [could] review the FARAK evidence at [his] office" before the hearing. Ballou forwarded the request to Irwin and Kaczmarek. Kaczmarek quickly responded, "No. This is still an open criminal case. I do not want defense attorneys going through evidence on a fishing expedition." As a result of

Kaczmarek's response, the parties did not arrange a time to view the evidence prior to the September 9 hearing.

Also on September 4, at a meeting in her office, Kaczmarek informed John Bossé, an assistant district attorney in Berkshire County, that he should advise defense attorneys that "all relevant discovery had been provided to the [DAOs]." Kaczmarek's statement to Bossé was materially false and intentionally misleading; it was not possible at that time for Kaczmarek to know whether all relevant evidence had been provided to the DAOs, as she had made no effort to review the evidence at the Springfield barracks.

Kaczmarek also did not review Ballou's file prior to the September 9 hearing, even though the subpoena required Ballou to bring his file to the hearing and to testify about the investigation. The board described Kaczmarek's failure to review the file and her failure to meet with and help prepare Ballou for the hearing a "dereliction of . . . duty," noting that "[a]ny prosecutor should want to review the contents of the lead investigator's file and all the evidence he had collected." No one from the AGO prepared Ballou for the hearing.

f. Superior Court proceedings. Foster represented the AGO at the September 9 Superior Court hearing before Judge Kinder, where her motion to quash the subpoena in the Watt case was denied. As to Foster's request for a protective order, Judge

Kinder asked: "Have you personally reviewed the file to determine that there are categories of documents in the file that fit the description of those that you wish to be protected?" Foster responded that she had not, but that she had spoken with Kaczmarek, who indicated that several documents, e-mail messages, and correspondences that had been requested would be protected as work product. Judge Kinder then asked, "But you don't know, having never even looked at the file, what those documents are?" Foster answered, "Correct."

Judge Kinder next asked whether the file was present, and Foster told him, incorrectly, that she did not believe it was. When Ballou was called to the stand, he brought his file with him. Ballou testified that "everything in my case file has been turned over." Olanoff asked if he knew whether everything in Kaczmarek's file had been turned over, and Ballou stated: "I believe everything pertaining to the Farak investigation has been turned over. I am not aware of anything else." This statement may have been true as it related to Ballou's case file, but this file was a subset of the totality of discovery material within the custody and control of the State police and the AGO. For example, the mental health worksheets were located at the Springfield barracks. Despite Judge Kinder's probing, Foster still did not request to see Ballou's file; Ballou

testified before the SHO that he would have shown it to her had she asked to see it.

At the conclusion of the hearing, with respect to the subpoena in the Watt case and the discovery motion in the Rodriguez case, Judge Kinder ordered Foster to send to him all responsive documents for which a claim of privilege was being asserted so he could conduct an in camera review.[6] Foster asked Judge Kinder to clarify the scope of his order, to which he responded by explaining that he did not want to see anything that had been turned over or that the AGO already had agreed to turn over, but that he did want to see the documents Foster believed were privileged or not discoverable.[7]

---

[6] Judge Kinder's order stated: "[W]hat I expect, again, if you can provide and that will be for my in camera review, those documents that you feel should not be disclosed with some indication somewhere in the body of the pleading why it is you feel those documents should not be disclosed."

[7] Foster then again asked Judge Kinder to clarify the scope of the Watt subpoena:

Foster: "It's just [that the] language of the subpoena was for all documents and photographs for the whole investigation, so I was wondering since the subpoena was for Sergeant Ballou, the documents he has or the documents the [AGO] has?"

Judge Kinder: "The subpoena duces tecum, as I understood it, went to Sergeant Ballou and that was the subpoena that you sought to quash."

Foster: "Correct."

Judge Kinder: "So that is what we are talking about."

The board characterized Foster's failure to review the file and lack of preparedness, particularly at the September 9 hearing, as "at best inconvenient and at worst incompetent."

The day after the hearing, in an e-mail message to Mazzone, Kaczmarek, Verner, Ravitz, and Reardon, Foster explained that her motion to quash had been rejected and that Judge Kinder had given them until September 18 to go through Ballou's file and to provide him anything that they thought was privileged, along with a memorandum explaining the basis for each privilege claim. Verner responded to the entire group almost immediately, asking: "Anne, can you get a sense from Joe what is in his file? Emails[,] etc[.]?  Kris, did the judge say his 'file' or did he indicate Joe had to search his emails[,] etc[.]?"

At that point, Verner reasonably believed that both Foster and Kaczmarek had reviewed Ballou's file; Foster was representing Ballou in court, and Kaczmarek had spent nine months on the case and had obtained indictments with Ballou's aid.  This belief was further supported by Kaczmarek's response to Verner's e-mail message, minutes later:  "Joe has all his reports and all reports generated in the case.  All photos and videos taken in the case.  His search warrants and returns. Copies of the paperwork seized from her car regarding new[s]

articles and her mental health worksheets."[8]  Verner then replied, "Is that every[thing] in his file?"  Kaczmarek responded:  "Yes.  By file, we are talking about his working file.  Think trial binder.  The boxes of actual evidence are in Springfield.  Log books (which we have copied), actual items taken from car, tote bag, and drawer (all of which are photographed)."

Later that same day, a brief meeting was held among Kaczmarek, Foster, Verner, Reardon, Ravitz, and Mazzone.  At that meeting, Kaczmarek informed the attendees that she believed everything in Ballou's file had been turned over.[9]

Kaczmarek did not clearly explain that the materials in Ballou's file were but a subset of the evidence stored at the Springfield barracks.  She also failed to inform her superiors that no one in the AGO had reviewed the evidence in Springfield.  On the basis of Kaczmarek's representations about Ballou's file, Verner believed that the mental health worksheets had been turned over.

---

[8] This was the first time the mental health worksheets had been mentioned to Foster.

[9] The SHO found that a meeting had been held at which Kaczmarek told Foster and the other attendees that everything had been turned over.  He did not make a finding as to the attendees, but none of the parties disputes Foster's or Reardon's testimony that Kaczmarek, Foster, Reardon, Ravitz, and Mazzone attended.  See Matter of Angwafo, 453 Mass. at 29, citing Isaiah I., 448 Mass. at 337.

That same day, Kaczmarek sent an e-mail message to Ballou asking, "Can you come to Boston sometime this week and bring your file so we can see what[']s in it?"  She then sent a message to Verner, confirming that she had asked Ballou "to come to Boston sometime this week so we/I can look at his file."  Verner thought that Kaczmarek was being cautious in requesting the file, wanting to confirm what was in it.

On September 12, Ballou brought his file to the AGO in Boston.  No one at the AGO reviewed it.  Foster unreasonably assumed Ballou and Kaczmarek would meet and that she was not invited to that meeting.  Kaczmarek expected someone else to review the file, not believing it to be her responsibility.  Verner assumed that Foster, in conjunction with Kaczmarek, would review the file.  Verner never followed up with Kaczmarek about her review of Ballou's file.

At a meeting with Verner and Mazzone on September 16, Ravitz told Foster that everything had been turned over and she should draft a letter to the judge saying as much.  Following those instructions, Foster prepared a letter to send to the judge concerning the Watt subpoena to Ballou.[10]  Before Foster

---

[10] The discovery motion in the Rodriguez case was denied on September 9 as untimely to the extent that it sought the production of additional discovery.  The judge took under advisement the question whether additional discovery should be forthcoming, and he ultimately denied this motion and general relief to Rodriguez later that year.

filed the letter with the court, Ravitz quickly reviewed the draft of the letter and approved it.  It stated:

"Dear Judge Kinder,

"On September 9, 2013, pursuant to a subpoena issued by defense counsel, you ordered the [AGO] to produce all documents in Sergeant Joseph Ballou's possession that the [AGO] believes to be privileged by September 18, 2013, to be reviewed by your [sic] Honor in camera.  After reviewing Sergeant Ballou's file, every document in his possession has already been disclosed.  This includes grand jury minutes and exhibits, and police reports.  Therefore, there is nothing for the [AGO] to produce for your review on September 18, 2013.  (Emphases added.)

"Please do not hesitate to contact me should your [sic] require anything further.

"Sincerely,

"Kris C. Foster"

The board found that the statements in Foster's letter were misleading and intentionally vague.  Contrary to Foster's assertion in her letter, no one at the AGO had reviewed Ballou's file and no one had determined whether every document in Ballou's possession had been disclosed.  The board found that by using the passive voice, Foster had intended to keep her statements vague so as to shield the AGO from further inquiry at that stage by the judge.  Further, in her letter, Foster did not distinguish between Ballou's case file and the larger set of evidence located at the Springfield barracks.  Ballou had substantial evidence in his "possession," including all documents from Farak's car, so Foster's reference to such

evidence was found by the board to be "reckless" and "misleading."

Ryan continued to press the AGO for access to documents related to Farak's tampering. On September 17, Ryan, in the Penate case, served a motion on the AGO and the State police to compel production of documents pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979). An attorney for the State police, Sean Farrell, sent an e-mail message to Kaczmarek seeking information she had on the discovery history and responses. Kaczmarek responded, "We also received this gem," warning Farrell "not [to] give this attorney an inch, he is very rude and aggressive." As to the specific categories requested by Ryan, Kaczmarek falsely implied that the AGO had no information in its files responsive to the Penate requests in its files. Farrell also reached out to Ballou, telling Ballou that Kaczmarek had advised him that there were no records responsive to certain requests and asking Ballou to confirm. Ballou responded to Farrell, including Kaczmarek on the e-mail message, explaining that his "entire investigative file ha[d] been turned over." Kaczmarek did not correct or clarify Ballou's statements.

The parties returned to court on October 2, where Foster once again represented to the court that all the contents of Ballou's file had been produced. Foster objected to Ryan's

argument for permission to view the physical evidence seized in the search of Farak's car, arguing that the evidence was irrelevant and that to allow one defense lawyer to look at it would "open the floodgates" to similar requests by other defendants.  In response to a comment by Judge Kinder that it might be helpful for her to look at the information about which she was making representations, Foster stated, "I have talked to [Kaczmarek and Ballou] and both of them said there's nothing - - there's no smoking gun . . . ."  The board found this statement to be inaccurate and misleading.  The judge denied Ryan's motion to inspect physical evidence, reasoning that "physical evidence has been described in detail for the defendant and photographs of that evidence have been provided."

Judge Kinder allowed Ryan's motion to compel production of documentary evidence "insofar as it [sought] production of drug testing administered to Sonja Farak by her employer, and any correspondence related directly to drug use or evidence tampering by Sonja Farak."  Foster, at the direction of Verner, and with the guidance of Ravitz and Kaczmarek, filed a motion to clarify what Judge Kinder meant by "correspondence."  After Kaczmarek reviewed the motion for clarification, she failed to ensure that all potentially exculpatory information known to her had been turned over to the DAOs.

Over the next two months, Judge Kinder denied discovery requests and other forms of relief to the consolidated defendants before him.  In general, he reasoned that the defendants had failed to show that Farak had been abusing drugs and tampering with evidence in 2011 or earlier, when the defendants had been arrested.  He denied a motion to dismiss filed by Ryan in Penate because there was insufficient evidence that Farak had engaged in misconduct in November 2011 and January 2012 when the defendant had been arrested and the drug samples had been tested.

The board found that Foster's letter's misguided phrasing, and her incompetence and lack of diligence, in part caused Judge Kinder to find that the defendants had not met their burden to show that Farak's misconduct had occurred early enough to make a difference in their cases.  The board also found that "defense counsel could have used the undisclosed mental health worksheets to show that Farak was engaged in drug tampering and drug abuse in 2011, and perhaps could have used the [2005] light cocaine case to attempt to show that Farak's drug tampering and drug use had extended back many years before 2011."

g.  Ryan's discovery of mental health worksheets.  In January 2014, Farak pleaded guilty to four counts of evidence tampering, four counts of larceny of a controlled substance from a dispensary, and two counts of unlawful possession of a class B

controlled substance. After the guilty plea and sentencing, the Farak matter was no longer an open criminal investigation, and the AGO had no basis for objecting to turning over evidence to defendants in related criminal matters.

On October 30, 2014, after the AGO assented to a motion to inspect physical evidence, Ryan was granted access to all the evidence that originally had been stored at the Springfield barracks.[11] Ryan saw the mental health worksheets and immediately recognized their significance. This was the first time any of the defendants affected by Farak's misconduct had gained access to the mental health worksheets and other potentially exculpatory evidence.

Ryan wrote an eleven-page letter to the AGO, detailing the withheld evidence, explaining its exculpatory value, and observing that "[i]t would be difficult to overstate the significance of these documents." On receiving the letter from Ryan, Verner immediately met with Foster, Ravitz, and Mazzone. Members of the Farak prosecution team were shocked, upset, and concerned that their office may have made inaccurate representations.

---

[11] Prior to Ryan's discovery, Kaczmarek had left the AGO to take a position as an assistant clerk-magistrate in the office of the clerk of the Superior Court for criminal business in Suffolk County.

Verner himself reviewed the entirety of the Farak material to ensure there was nothing else that had not been produced. On November 13, 2014, the AGO produced an additional 289 pages of previously undisclosed documents, including the mental health worksheets and other papers that supported a strong inference that Farak's misconduct began before 2012.

In December 2016, Superior Court Judge Richard Carey held a six-day evidentiary hearing in Hampden County on renewed motions to dismiss and motions for new trials or to withdraw guilty pleas filed by ten defendants who claimed a right to relief based on Farak's tampering and the AGO's misconduct.[12] All three respondents testified under oath before the judge, who granted relief to some of the defendants, focusing mostly on those whose certificates of drug analysis (drug certificates) had been signed by Farak. The Committee for Public Counsel Services (CPCS) and other defendants then sought relief in this court pursuant to G. L. c. 211, § 3, and G. L. c. 231A, § 1.

On October 11, 2018, we ordered relief for the defendants affected by Farak's misconduct, dismissing (1) "all convictions based on evidence that was tested at the Amherst lab on or after

---

[12] The SHO did not admit in evidence the judge's 2017 findings and conclusions of law, except for three pages of his final memorandum and order. The majority of the judge's findings, therefore, were not considered as part of these proceedings.

January 1, 2009, regardless of the chemist who signed the drug certificate," and (2) "all methamphetamine convictions where the drugs were tested during Farak's tenure at the Amherst lab." Committee for Pub. Counsel Servs., 480 Mass. at 729. Unlike in the Dookhan cases, where we established a conclusive presumption of government misconduct, see Bridgeman, 476 Mass. at 321-322, we concluded that the more drastic remedy of dismissal was required for Farak defendants because the government misconduct by Farak and the assistant attorneys general was "so intentional and so egregious" (citation omitted), Committee for Pub. Counsel Servs., supra at 725.

2. Procedural history. In June 2019, bar counsel filed a three-count petition for discipline against Foster, Kaczmarek, and Verner, alleging multiple violations of the Massachusetts rules of professional conduct related to the AGO's prosecution of Farak. The first count alleged violations stemming from Verner and Kaczmarek's failure to disclose to the DAOs potentially exculpatory information as to the timing and scope of Farak's drug use and tampering, as well as Verner's failure to fulfill his duties as Kaczmarek's supervisor. The second count alleged violations stemming from Kaczmarek's failure to disclose to Flannery, Bossé, and Farrell potentially exculpatory information, and Verner's failure to ensure that Kaczmarek had made such disclosures. The third count alleged violations

stemming from Foster's response to the Watt subpoena and the Rodriguez and Penate motions, Kaczmarek's failure to undertake a review of her file and to produce documents in response to the subpoena and discovery motions, Kaczmarek's failure to alert Foster to the existence of undisclosed documents, and Kaczmarek's and Verner's failure to ensure that potentially exculpatory information had been disclosed following their respective reviews of the motion to clarify.

The respondents filed their answers in August 2019. On Foster's motion, the board chair appointed an SHO to preside over the proceedings. See S.J.C. Rule 4:01, § 5 (3) (d), as amended, 453 Mass. 1305 (2009). An evidentiary hearing was held by video conference over the course of twenty-three nonconsecutive days, beginning in September 2020 and ending in December 2020, and included testimony from fifteen witnesses and the submission of 305 exhibits.

In July 2021, the SHO issued his hearing report. On the first count of the petition, the SHO concluded that Kaczmarek, by failing to disclose to the DAOs potentially exculpatory evidence known to her, violated Mass. R. Prof. C. 1.1, 426 Mass. 1308 (1998) (provide competent representation); Mass. R. Prof. C. 1.3, 426 Mass. 1313 (1998) (act with diligence in representing client); Mass. R. Prof. C. 3.4 (a), 426 Mass. 1389 (1998) (do not obstruct another's access to evidence); Mass. R.

Prof. C. 3.4 (c), 426 Mass. 1389 (1998) (do not knowingly disobey obligation under rules of tribunal); Mass. R. Prof. C. 3.8 (d), 426 Mass. 1389 (1998) (as prosecutor, timely disclose to defense all evidence or information known to prosecutor that tends to negate guilt or mitigates offense); and Mass. R. Prof. C. 8.4 (d), 426 Mass. 1429 (1998) (do not engage in conduct prejudicial to administration of justice). The SHO concluded that Verner violated Mass. R. Prof. C. 1.3; and Mass. R. Prof. C. 5.1 (b), 426 Mass. 1405 (1998) (as supervising attorney, make reasonable efforts to ensure that supervised lawyer's conduct conforms to rules of professional conduct). The SHO concluded that bar counsel had not proved that Verner had violated any other rules.

On the second count of the petition, the SHO concluded that Kaczmarek, by knowingly failing to disclose potentially exculpatory evidence and by knowingly making materially misleading statements to assistant district attorneys Bossé and Flannery and State police counsel Farrell, had violated Mass. R. Prof. C. 1.1, 1.3, 3.4 (a), 3.4 (c), and 3.8 (d); Mass. R. Prof. C. 4.1 (a), 426 Mass. 1401 (1998) (do not knowingly make false statement of material fact to third person); Mass. R. Prof. C. 8.4 (a), 426 Mass. 1429 (1998) (do not knowingly assist or induce another to violate rules of professional conduct or do so through acts of another); Mass. R. Prof. C. 8.4 (c) (do not

engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); Mass. R. Prof. C. 8.4 (d); and Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998) (do not engage in any other conduct that adversely reflects on fitness to practice law). He also found that, by failing to direct Ballou to provide Flannery with potentially exculpatory information known to her, Kaczmarek violated Mass. R. Prof. C. 1.1, 1.3, 3.4 (a), 3.4 (c), and 3.8 (d); Mass. R. Prof. C. 5.3 (b), 426 Mass. 1408 (1998) (as supervisory lawyer over nonlawyer, make sure nonlawyer's conduct complies with lawyer's obligations); and Mass. R. Prof. C. 8.4 (a), 8.4 (d), and 8.4 (h). Finally, he found that, by failing to take remedial action when she learned that Ballou had not disclosed potentially exculpatory evidence to Flannery, Kaczmarek had violated Mass. R. Prof. C. 5.3 (c) (2), as appearing in 426 Mass. 1408 (1998) (as supervisory lawyer, take remedial action to avoid or mitigate misconduct by nonlawyer). The SHO concluded that Verner was not responsible for any of the alleged rules violations on the second count.

On the third count of the petition, the SHO determined that Foster had committed violations of Mass. R. Prof. C. 1.1; Mass. R. Prof. C. 1.2 (a), 426 Mass. 1310 (1998) (seek lawful objectives of client through reasonably available means permitted by law and rules of professional conduct); and Mass.

R. Prof. C. 1.3, by failing to adequately prepare to respond to subpoenas and appear at hearings regarding the production of evidence and by failing to ensure that the AGO reviewed Ballou's file. The SHO also concluded that, by drafting a letter with reckless disregard for the truth that misled the judge to believe that the entirety of the file had been reviewed and all documents had been produced, Foster had violated Mass. R. Prof. C. 8.4 (d) and 8.4 (h). The SHO rejected Foster's argument that Mass. R. Prof. C. 5.2 (b), 426 Mass. 1407 (1998) (subordinate lawyer may act in accordance with supervisory lawyer's reasonable resolution of arguable question of duty), relieved her of responsibility because she had been acting in accordance with her supervisor's instructions. The SHO held that Kaczmarek, by failing to undertake a review of her file and produce documents responsive to the subpoenas and discovery motions, and by failing to alert Foster to the existence of undisclosed documents, had violated Mass. R. Prof. C. 1.1, 1.3, and 3.4 (c). Finally, the SHO concluded that, by failing to ensure that potentially exculpatory information known to her had been disclosed following her review of the motion to clarify, Kaczmarek had violated Mass. R. Prof. C. 1.1, 1.3, 3.4 (a), and 8.4 (d). The SHO found that bar counsel had not proved any of the charges against Verner in the third count.

In October 2021, the SHO issued a supplemental report detailing aggravating and mitigating factors, and recommended sanctions, for each respondent. Based on his findings, the SHO recommended a public reprimand for Verner, a suspension of one year and one day for Foster, and a two-year suspension for Kaczmarek.

Bar counsel and Foster filed timely appeals with the board. Bar counsel challenged the sanctions for all three respondents, arguing that the SHO improperly considered several mitigating factors and failed to consider notable aggravating factors. Neither Kaczmarek nor Verner appealed from the SHO's findings and conclusions.

In June 2022, the board issued its final memorandum. The board adopted the SHO's recommendation of a suspension of one year and one day for Foster, but recommended a three-month suspension for Verner and disbarment for Kaczmarek. The board thereafter filed an information with a single justice of this court pursuant to S.J.C. Rule 4:01, § 8 (6), in addition to a motion to reserve and report without decision. In November 2022, a single justice reserved and reported the case to the full court.

3. Discussion. a. Standard of review. "In bar disciplinary cases where a single justice has reserved and reported the case to the full court, we review the matter and

'reach our own conclusion.'" Matter of Finneran, 455 Mass. 722, 730 (2010), quoting Matter of Wainwright, 448 Mass. 378, 384 (2007).  In doing so, we keep in mind that the disciplinary rules exist to "protect the public and maintain its confidence in the integrity of the bar and the fairness and impartiality of our legal system." Matter of Curry, 450 Mass. 503, 520-521 (2008).  Accordingly, "[t]he appropriate level of discipline is that which is necessary to deter other attorneys and to protect the public." Matter of Zak, 476 Mass. 1034, 1038 (2017), quoting Matter of Curry, supra at 530.  To ensure that a recommended disciplinary sanction achieves its desired ends, we focus our review on whether it is "markedly disparate from judgments in comparable cases." Matter of McBride, 449 Mass. 154, 163 (2007).  It is not necessary to this endeavor, however, that we "find perfectly analogous cases" (citation omitted). Matter of Doyle, 429 Mass. 1013, 1014 (1999).  Where no analogous cases exist, we "must establish independently a sanction adequate to address the seriousness of the misconduct." Matter of Foley, 439 Mass. 324, 339 (2003).  Each case "must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." Matter of Murray, 455 Mass. 872, 883 (2010), quoting Matter of the Discipline of an Attorney, 392 Mass. 827, 837 (1984).

Although the board's findings and recommendations are not binding on the court, they are "entitled to great weight." Matter of Fordham, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). We generally afford substantial deference to the board's recommended disciplinary sanction. See Matter of Griffith, 440 Mass. 500, 507 (2003). Further, we defer to the board's findings of subsidiary facts if they are "supported by substantial evidence, upon consideration of the record." Matter of Murray, 455 Mass. at 879, quoting S.J.C. Rule 4:01, § 8 (4). We may, however, draw reasonable inferences from the board's findings. See Matter of Driscoll, 447 Mass. 678, 685 (2006), citing Matter of Orfanello, 411 Mass. 551, 556 (1992). The SHO is the sole judge of the credibility of the testimony presented at the hearing. S.J.C. Rule 4:01, § 8 (5) (a).

b. Verner. The SHO found that Verner violated Mass. R. Prof. C. 1.3 and 5.1 (b) because he failed to follow up with Kaczmarek about whether she had disclosed the mental health worksheets, along with all other potentially exculpatory information, to the DAOs. The SHO also found that Verner neglected his supervisory duties when he failed to follow up with Kaczmarek about the contents of Ballou's file, and likewise failed to verify whether all potentially exculpatory evidence in that file had been disclosed, following Kaczmarek's e-mail message on September 10. The board adopted these findings, and

Verner does not dispute them.  Verner argues, however, that a
public reprimand, rather than a three-month suspension, is the
appropriate sanction for his violations.  Bar counsel argues
that, as the board concluded, Verner's misconduct warrants a
suspension.

i.  Reliance as mitigating factor.  "In assessing the
appropriate level of discipline, [we] must . . . consider
factors that mitigate, and those that aggravate, the misconduct
the lawyer committed."  Board of Bar Overseers, Massachusetts
Bar Discipline:  History, Practice, and Procedure 62 (2018)
(Massachusetts Bar Discipline).  The SHO found as mitigating
that Verner relied on Kaczmarek's September 10, 2013, statement
that she had turned over everything in Ballou's file, including
the mental health worksheets.  The board, on the other hand,
concluded that Verner's reliance was not mitigating, because
Verner nonetheless had a duty to follow up rather than accept
the statement at face value.  Accordingly, the board found that
no factors mitigated Verner's misconduct.  Verner argues that
his reliance should be treated as a mitigating factor.  Bar
counsel argues that we should adopt the board's reasoning.

We conclude that Verner's misconduct is mitigated by his
reliance on Kaczmarek's false representations.  Reliance, when
it is reasonable and in good faith, may indicate a lesser degree
of culpability.  See Massachusetts Bar Discipline, supra at 393

("The principle underlying a special mitigating consideration is that it shows that the lawyer who committed misconduct acted unintentionally, had some reason beyond the attorney's voluntary control for engaging in the misconduct, or was less culpable than the category of misconduct would otherwise imply").

Verner's reliance was reasonable and in good faith: Kaczmarek was Verner's subordinate, and Verner knew her to be an experienced prosecutor who had demonstrated her competence during her work on the Dookhan case.  See Admonition No. 19-09, 35 Mass. Att'y Discipline Rep. 698, 698-699 (2019) (respondent's failure to ensure filing of motion for postconviction relief was mitigated by his reliance on more experienced co-counsel's false representation that motion had been filed); Camilo-Robles v. Zapata, 175 F.3d 41, 46 & n.2 (1st Cir. 1999) (attorney is "entitled to rely, at least to some extent, on the work of his predecessors and subordinates" because for "bureaucratic structures . . . to function, the ability to delegate responsibility and to trust the judgments of others is essential").  In addition, by the time Kaczmarek represented that Ballou's file had been turned over, she had been in charge of the Farak investigation and prosecution for nine months, and there had been no signs indicating that Kaczmarek was not complying with the rules of professional conduct.  Contrast Attorney Grievance Comm'n of Md. v. Kimmel, 405 Md. 647, 673

(2008) ("numerous warning or alert indicators should have informed the . . . managing attorneys . . . of the need for more heightened supervision").

Although the SHO found that Verner should have followed up with Kaczmarek to ensure that she indeed had disclosed all potentially exculpatory evidence, Kaczmarek's deceit gave Verner some reason to believe that such follow up was unnecessary. See Matter of Newman, 31 Mass. Att'y Discipline Rep. 482, 483 (2015) (in mitigation, respondent made false representations after consulting "with an experienced appellate lawyer, who incorrectly advised the respondent that [his contemplated actions would be] appropriate").[13]

Bar counsel argues that, even if reasonable and good faith reliance is a mitigating factor, in the context of a rule 5.1 (b) violation it is a "typical" mitigating factor, and so should be discounted. Typical mitigating factors are those that "are common to almost all such violations by an attorney." Matter of Barkin, 1 Mass. Att'y Discipline Rep. 18, 21 (1977). See Matter of Parigian, 33 Mass. Att'y Discipline Rep. 375, 381 (2017) (typical mitigating factors include "unblemished

---

[13] Bar counsel argues that Verner's belief that the mental health worksheets had been turned over was not reasonable because, had the worksheets been disclosed, there would have been a flood of motions to dismiss or for a new trial. Bar counsel, however, does not point to anything in the record that indicates Verner should have had such an expectation.

disciplinary record" and "cooperation with bar counsel"). They are generally "not given great weight in determining the appropriate sanction." Matter of Crossen, 450 Mass. 533, 576 n.55 (2008). By contrast, "special" mitigating factors are those that generally do warrant a deviation from the "usual and presumptive sanction." See Matter of Otis, 438 Mass. 1016, 1017 (2003), quoting Matter of Concemi, 422 Mass. 326, 330 (1996).

We conclude that reasonable and good faith reliance is a special rather than a typical mitigating factor, and so should weigh in favor of a lesser sanction. See Matter of Finneran, 455 Mass. at 736. Unlike the mitigating factors that this court previously has found to be typical, reasonable and good faith reliance on another attorney is not an excuse that generally will be available to attorneys -- supervisory or otherwise -- who have engaged in misconduct. See Matter of Gleason, 28 Mass. Att'y Discipline Rep. 352, 354-355 (2012) (rule 5.1 [b] violation stemmed from respondent's failure to discuss case with associate, rather than any misrepresentations by associate); Kimmel, 405 Md. at 677-678 (rule 5.1 [b] violation stemmed from failure to provide support following subordinate's requests for help). Even where there is reliance, it will not always be reasonable and in good faith. See Matter of McDonald, 18 Mass. Att'y Discipline Rep. 382, 388 (2002) (respondent placed "too much trust in his friend and colleague" when he relied "upon his

representations as to the progress of the case"); In re Dickens, 174 A.3d 283, 298 (D.C. Ct. App. 2017) (respondent violated rule 5.1 [a] because she "ignored clear warning signs that the trust and confidence" placed in associate "was no longer justified").

ii. Aggravating factors. The board's recommendation that Verner receive a suspension was based in part on several aggravating circumstances. This included Verner's years of experience as a lawyer and prosecutor, the extent of the harm to and the vulnerability of the victims, the notoriety of the case and the deleterious effect on the public's confidence in the criminal justice system, and the lack of candor he demonstrated in his testimony.

We first address the board's conclusion that Verner lacked candor in his testimony. The board's conclusion was based solely on Verner's denial that he had read Ballou's February 14, 2013, e-mail message and its attachments. The SHO found that, because Verner was detail-oriented and this was a high-profile case, it was not plausible that Verner had failed to review the e-mail message and its attachments. The board, but not the SHO, characterized Verner's contention that he had not seen Ballou's message as a "self-servingly untruthful denial." Verner argues that the board erred in finding a lack of candor in his testimony.

We agree with Verner. The SHO, whose task it is to determine whether a respondent's testimony was "deliberately false or . . . merely confused or mistaken," did not find Verner's representation about Ballou's e-mail message to be a deliberate falsehood. Matter of Hoicka, 442 Mass. 1004, 1006 (2004). See Strigler v. Board of Bar Examiners, 448 Mass. 1027, 1029-1030 (2007) (distinguishing failure to remember from lack of candor). This is in contrast to the SHO's finding that Foster's testimony was "dissembling, disingenuous[], and evasive[]," and his finding that Kaczmarek's testimony was "vague" and "dissembling." Instead, the SHO found that "during the hearings, Verner demonstrated candor, remorse, and a recognition of and responsibility for his mistakes," and that Verner's "forthrightness . . . [was] noteworthy and laudatory." See Matter of Johnson, 452 Mass. 1010, 1011 (2008), quoting S.J.C. Rule 4:01, § 8 (4) ("special hearing officer is the 'sole judge of the credibility of the testimony presented at the hearing'").

Verner next argues that the board erred in considering his experience as an aggravating factor, given that virtually all supervising attorneys are experienced. This argument is unavailing. See Matter of Corbett, 478 Mass. 1004, 1007 (2017) ("substantial experience in the practice of law" may be considered as aggravating factor by board). Verner does not

provide any legal authority to suggest that we categorize aggravating factors in terms of whether they are "typical." Contrast Matter of Otis, 438 Mass. at 1017 n.3 (discussing "typical" mitigating factors). Regardless, however, the board did not merely focus on Verner's experience as an attorney generally; instead, the board considered Verner's extensive experience as a supervising attorney to be aggravating. See Admonition No. 22-06, 38 Mass. Att'y Discipline Rep.     ,     (2021) (particular type of experience may be considered as aggravating factor). In particular, Verner served in three different supervisory positions during the time he worked as a prosecutor in the office of the district attorney for the northern district. While virtually all supervisory attorneys may be experienced, this amount of supervisory experience is not necessarily typical. We therefore hold Verner to a higher standard than a supervising attorney who lacks such experience. See Matter of Moran, 479 Mass. 1016, 1022 (2018) ("substantial experience in the . . . practice area in which the misconduct occurred . . . properly was considered an aggravating factor").

Verner also contends that consideration of his experience was inappropriate because the board did not draw a causal connection between his experience and the charged misconduct. This argument also fails. Experience is considered as an

aggravating factor because an "experienced attorney should understand ethical obligations to a greater degree than a neophyte." Matter of Luongo, 416 Mass. 308, 312 (1993). Verner's experience, therefore, can be said to have aggravated Verner's misconduct without having caused it. See Matter of Weisman, 30 Mass. Att'y Discipline Rep. 440, 455 (2014) (citing experience as aggravating factor without drawing causal connection).

Finally, Verner argues that the board erred by including as an aggravating factor the significant harm that resulted from the AGO's failure to disclose exculpatory evidence. According to Verner, because his misconduct was not willful, and because he made some reasonable efforts to supervise Kaczmarek, he did not cause the harm that resulted. Verner points to the SHO's conclusion that, because Kaczmarek's actions "were deliberate acts for which Verner bore no responsibility," there was "no causal connection between Verner's lack of follow-up . . . and the harm that ensued." The board disagreed with the SHO and concluded that Verner's failure to adequately supervise Kaczmarek caused "catastrophic harm."

Verner's argument misses the mark. The SHO found that Kaczmarek's failure to disclose potentially exculpatory evidence was "due at least in part to Verner's failure adequately and diligently to supervise . . . and follow up with her." This

finding, which Verner does not dispute, plainly establishes that Verner's misconduct was a contributing cause of the harm that resulted. See Matter of Nealon, 26 Mass. Att'y Discipline Rep. 427, 429, 435 (2010) (respondent's failure to take remedial action after learning of subordinate attorney's "ongoing delay and neglect of the estate . . . resulted in potential or actual harm"). There is simply no legal authority to support the SHO's reasoning that, because Kaczmarek's acts were deliberate, Verner cannot be held responsible for the harms that resulted from his failure to prevent her misconduct. Under rule 5.1, Verner was not entitled to assume that Kaczmarek would "inevitably conform" to the rules of professional conduct. See Mass. R. Prof. C. 5.1 comment 2.

The harm that resulted from the combined misconduct of Verner, Foster, and Kaczmarek cannot be overstated. Over the course of a year, from October 2013 through the time defense attorney Ryan discovered the exculpatory mental health worksheets in October 2014, many criminal defendants were found guilty, admitted to sufficient facts, or pleaded guilty because of the AGO's failure to turn over exculpatory evidence. Thousands of defendants, who otherwise would have been eligible for relief at an earlier date, remained incarcerated during this time. As a result of Farak's prolonged misconduct and the AGO's failure to produce exculpatory evidence relating to that

misconduct, this court dismissed with prejudice thousands of convictions based on drug offenses.  See Committee for Pub. Counsel Servs., 480 Mass. at 704-705.  We held that "[t]he government misconduct by Farak and the assistant attorneys general[14] was 'so intentional and so egregious' that [the] harsher sanction[]" of dismissal with prejudice was necessary. Id. at 725, quoting Bridgeman, 476 Mass. at 322.  This was a system-wide failure.  It is unsurprising that "the publicity has taken an ugly toll on the public's perception of the legal profession and those who practice it."  Matter of Donahue, 22 Mass. Att'y Discipline Rep. 193, 276 (2006).

While harm is not everything, it is properly taken into account as an aggravating factor for all three respondents here. See Matter of Heartquist, 29 Mass. Att'y Discipline Rep. 332, 333-334 (2013).  Generally speaking, the more culpable a respondent is in causing harm, however, the more heavily the harm weighs in aggravation.  See, e.g., Matter of Curry, 450 Mass. at 531 (disbarment); Matter of Crossen, 450 Mass. at 576 (disbarment); Matter of Donahue, 22 Mass. Att'y Discipline Rep. at 276-277 (three-year suspension for Donahue, whose "overall

---

[14] Our holding in that case, which was based on Judge Carey's findings, was only with regards to the misconduct of Kaczmarek and Foster.  See Committee for Pub. Counsel Servs., 480 Mass. at 720.  Judge Carey, unlike the SHO, determined that "the misconduct by the [AGO] was limited to Foster and Kaczmarek."  Id.

involvement did not approach the scope or severity of Curry's or Crossen's").

iii. <u>Verner's sanction</u>. In <u>Matter of Kane</u>, 13 Mass. Att'y Discipline Rep. 321, 327-328 (1997), the board set forth the presumptive sanctions in matters involving "neglect or failure of zealous representation." The board held that, absent aggravating and mitigating factors, a public reprimand is "generally appropriate where a lawyer has failed to act with reasonable diligence . . . or otherwise has neglected a legal matter and the lawyer's misconduct causes serious injury or potentially serious injury to a client or others." <u>Id</u>. at 327. The board further explained that suspension is generally warranted for misconduct that, in addition to causing serious or potentially serious injury, involves "repeated failures to act with reasonable diligence, or . . . a pattern of neglect." <u>Id</u>. at 328. This court has endorsed these principles. See <u>Matter of Grayer</u>, 483 Mass. 1013, 1018 (2019). See also Massachusetts Bar Institute, New Massachusetts Rules of Professional Conduct 110 (1998) ("Public reprimand or private admonition may be considered if the lawyer's conduct is merely negligent").

The question, then, is whether Verner's misconduct was of the sort that warrants a more severe sanction than public reprimand. Rule violations that involve the neglect of supervisory duties have "never resulted in a disbarment or a

suspension unless combined with other rules violations." Massachusetts Bar Discipline, supra at 327. According to the board, however, Verner did not merely engage in "'run-of-the-mill' negligence." Rather, the board concluded that Verner, by passively relying on his subordinates to comply with the rules of professional conduct, abdicated his responsibility to ensure such compliance, and thereby took part in "protracted" negligence. For these reasons, in addition to aggravating circumstances, the board recommended that Verner receive a three-month suspension. The SHO, in contrast, had recommended that Verner receive a public reprimand.

We conclude that Verner did not engage in a pattern of neglect. Generally, either several instances of misconduct or a protracted period of neglect are necessary before a "pattern of neglect" finding is appropriate. See American Bar Association, Annotated Standards for Imposing Lawyer Sanctions 202 (2d ed. 2019). Verner's misconduct was limited to a single matter. Contrast Matter of Lagana, 26 Mass. Att'y Discipline Rep. 295, 298 (2010) (three-month suspension stayed for year[15] for repeated

---

[15] A stayed suspension is "effectively a public reprimand, but with more teeth and a greater opportunity for ongoing monitoring." Board of Bar Overseers, Massachusetts Bar Discipline: History, Practice, and Procedure 51 (2018). The board has stated that "staying all or part of a suspension that would otherwise be appropriate for the misconduct involved should be reserved for matters in which the stay itself functions as an incentive or a deterrent, as the case may be, to

neglect of client's temporary protected status application and, in a separate matter, violating rules 5.1 [a] and 5.1 [b]; misconduct aggravated by substantial experience, previous admonition for similar misconduct, lack of candor, and harm to clients). Further, Verner did not commit several rule violations with respect to a particular matter over an extended period of time. Contrast Matter of Perrault, 29 Mass. Att'y Discipline Rep. 531, 532-534 (2013) (three-month suspension stayed for year for several instances over period of years in which both respondent and, as result of inadequate supervision, his inexperienced associate did not handle matters diligently and efficiently, to detriment of estate; aggravated by prior disciplinary history). Rather, he neglected to follow up with Kaczmarek on two occasions -- after he instructed her on the prosecution memorandum to disclose the mental health worksheets, and after Kaczmarek said she would review Ballou's file when he came to Boston. This does not constitute the sort of pattern of neglect that warrants a suspension. See Massachusetts Bar Discipline, supra at 124 ("a lawyer who neglects a single matter and causes harm ought to receive a public reprimand").

---

encourage or discourage certain conduct, whether for the sake of safeguarding the public or assisting the lawyer to take certain remedial steps, or both." Matter of O'Neill, 30 Mass. Att'y Discipline Rep. 289, 295 (2014).

Further, Verner did take some steps to ensure that Kaczmarek would disclose potentially exculpatory evidence. Verner chose to adopt the discovery policy used in the Dookhan case and made this policy known to Kaczmarek. Verner additionally wrote the initial letter informing the DAOs of the AGO's obligation to provide potentially exculpatory information, which was reviewed by Kaczmarek. Finally, Verner communicated with Kaczmarek about particular decisions related to the disclosure of exculpatory information. Verner instructed Kaczmarek to disclose the mental health worksheets in his feedback on her prosecution memorandum, and he attempted to gain an understanding of what was in Ballou's file, and whether it had been turned over, following the September 9 hearing. See American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Op. 467, at 10 (Sept. 8, 2014) (among appropriate measures that supervising prosecutor might adopt, he or she might participate in major decisions such as "identifying Brady material, and, where feasible, documenting the basis for [such] decisions in writing," and he or she might "designat[e] a specific attorney to oversee the review of files for Brady material"). Contrast Matter of Myers, 355 S.C. 1, 9, 15 (2003) (respondent received private reprimand after failing to instruct his subordinate to "inform the defense of [an] eavesdropped conversation").

Because of Kaczmarek's experience handling the Dookhan case, Verner also was not required to engage in the sort of oversight that might have been required of a less experienced attorney. See Admonition No. 18-31, 34 Mass. Att'y Discipline Rep. 632, 632 (2018) (respondent should have engaged in greater "supervision of [subordinate] lawyer's activities" because lawyer "lacked sufficient experience to handle the [case] without oversight and guidance"). Rather, Verner had reason to believe that Kaczmarek was competent to engage in the processes necessary to uncover and disclose potentially exculpatory evidence. See In re Dickens, 174 A.3d at 303 (less oversight is needed "for a small firm with experienced attorneys"). Indeed, the SHO found that, excepting the instances where Verner should have followed up with Kaczmarek, Verner was "entitled to rely on [her] to discharge competently and fully the duty to disclose exculpatory evidence."

The board's recommendation that Verner be suspended, however, was not only grounded in the extent of Verner's negligence; the board also took into account the aforementioned aggravating factors, as well as an absence of mitigating factors. We conclude that, once the mitigating effect of Verner's reliance on Kaczmarek is considered, the factors aggravating Verner's misconduct do not warrant a suspension. See S.J.C. Rule 3:07 scope 5, as appearing in 426 Mass. 1301

(1998) ("the severity of a sanction . . . depend[s] on all the circumstances, including the wilfulness and seriousness of the violation, [and] extenuating factors").

The board's decision in Matter of Gleason, 28 Mass. Att'y Discipline Rep. at 352-357, is instructive. There, the respondent reviewed a complaint written by an associate over whom he had supervisory authority, but "did not take any action to have it corrected or filed before the expiration of the statutes of limitations against [the defendants]." See id. at 353-354. Further, over the course of seven years, the respondent did not discuss the case with the associate and took no "action[s] of substance to determine the actual status of the case" throughout its proceedings. See id. at 354. This led the respondent to negligently misrepresent to his clients on multiple occasions that their case was proceeding. See id. The board found that the respondent's misconduct was aggravated by his substantial experience, the protracted nature of his negligence, and the harm suffered by his clients. See id. at 356. The only mitigating factors found by the board were typical. See id. The respondent received a public reprimand. See id. at 356-357. See also Matter of Goldberg, 34 Mass. Att'y Discipline Rep. 135, 136-138 (2018) (respondent received public reprimand for widespread practice of allowing attorneys and other staff members to sign respondent's name to pleadings and

motions without respondent's review, resulting in default of client's case, as well as false representations to court).

Verner, unlike the respondent in Matter of Gleason, did take actions to determine the status of the case under his supervision. Most notably, Verner inquired into the contents of Ballou's file, which led Kaczmarek to falsely represent to him that everything in the file, including the mental health worksheets, had been disclosed. Kaczmarek's representation bolstered Verner's already reasonable expectation that she would disclose all potentially exculpatory evidence.

In the absence of said expectation and reliance, Verner's misconduct might have resembled the sort of negligence that warrants a public reprimand. See Matter of Gleason, 28 Mass. Att'y Discipline Rep. at 356. But see Matter of Myers, 355 S.C. at 8-9. Verner's misconduct is somewhat excused, however, because he had reason to believe that Kaczmarek was complying with the rules of professional conduct. See Matter of the Discipline of an Attorney, 448 Mass. 819, 831, 833-835 (2007) (private admonition, rather than public reprimand, issued for misleading statements to clients because respondent's misconduct was mitigated by his inexperience and absence of selfish motive). Hence, absent aggravating factors, a private reprimand would be appropriate. See Matter of Kane, 13 Mass. Att'y

Discipline Rep. at 327 (presumed sanctions are "[a]bsent aggravating and mitigating factors").

Because Verner's negligence was also aggravated by several aforementioned factors, however, we conclude that a public reprimand is warranted. See Matter of Anderson, 416 Mass. 521, 525-526 (1993) (public censure, rather than private reprimand, warranted because of respondent's twenty-year history of neglecting clients and violating disciplinary rules). Verner had experience as a supervisor, his misconduct caused harm that was "particularly outrageous" to victims who were vulnerable, and the Farak case has taken on public notoriety. Matter of Kane, 13 Mass. Att'y Discipline Rep. at 329. These factors suffice to warrant the issuance of a public reprimand. See Matter of Kelley, 489 Mass. 300, 307 (2022) (public reprimand, rather than private admonition, warranted because respondent had "substantial experience" and previous disciplinary history, and "committed multiple rules violations involving multiple clients, . . . who were vulnerable individuals").

c. Foster. Bar counsel appeals from the board's conclusion that Foster did not violate rule 8.4 (c). Foster appeals from the sanction recommended by the board, a term suspension of one year and one day. We address each in turn.

i. Alleged rule 8.4 (c) violation. Bar counsel charged Foster with violating rule 8.4 (c), alleging that she knowingly

made materially misleading statements to Judge Kinder in her September 16 letter. More specifically, bar counsel took issue with Foster's deliberate obfuscation regarding who reviewed Ballou's file when she wrote "[a]fter reviewing Sergeant Ballou's file," and her reckless expansion of the alleged review to include "every document in [Ballou's] possession." The SHO found that although a "close call," Foster's use of intentionally vague language did not rise to the level of conduct sanctioned by rule 8.4 (c); while grossly incompetent and reckless, Foster's statements were not knowingly false statements of material fact.

On appeal, bar counsel challenges this determination and asks us to conclude that Foster intended to deceive Judge Kinder into believing that she had personal knowledge that Ballou's file had been reviewed and that everything had been turned over or, alternatively, to hold that Foster knew that the statements she made in her letter were false based on principles of willful blindness.

"It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Mass. R. Prof. C. 8.4 (c). To prove a violation of rule 8.4 (c), bar counsel must establish either (1) an intent to deceive or (2) at least knowledge of the falsity and an understanding that someone will likely rely on

it.  Matter of Zimmerman, 17 Mass. Att'y Discipline Rep. 633, 645-646 (2001).  See Matter of Grossman, 448 Mass. 151, 155, 157, 161-162 (2007) (respondent violated rule 8.4 [c] when she "intentionally altered" documents submitted to bar counsel "knowing that it was false"); Matter of MacDonald, 23 Mass. Att'y Discipline Rep. 411, 415 (2007) (respondent made "knowingly false statements of fact" in affidavits submitted to court in violation of rule 8.4 [c]).  A lawyer's knowledge of a fact may be proved by circumstantial evidence.  Matter of Zimmerman, supra at 646, quoting Mass. R. Prof. C. 9 (f) (now rule 1 [h]) ("A person's knowledge may be inferred from the circumstances").  Further, "a lawyer cannot avoid 'knowing' a fact by purposefully refusing to look."  Zimmerman, supra.  Under the doctrine of willful blindness, a lawyer's "studied ignorance of a readily accessible fact by consciously avoiding it is the functional equivalent of knowledge of the fact."  Id.

The SHO found that Foster did not have actual knowledge that "no one had reviewed Ballou's file[,] and no one had determined whether every document in his possession had already been disclosed."  Specifically, the SHO determined that Foster's statements "were not knowing false statements of material fact."  See Admonition No. 02-13, 18 Mass. Att'y Discipline Rep. 640, 652, 654 (2002), citing Matter of Provanzano, 5 Mass. Att'y Discipline Rep. 300, 302 (1987) (no violation of [S.J.C. Rule

3:07, Canon 1, DR 1-102 (A) (4),] where respondent's statements in affidavit "may have been misleading" but "were not intentionally false"). The SHO's finding that Foster lacked actual knowledge is based on a credibility determination that we do not disturb. See Matter of Zimmerman, 17 Mass. Att'y Discipline Rep. at 647 (accepting hearing committee's subsidiary findings on respondent's subjective knowledge, based on committee's credibility determinations); Matter of Provanzano, 5 Mass. Att'y Discipline Rep. at 304 (credibility findings by the hearing officer shall not be disturbed "absent some clear error").

To support a finding of willful blindness, the facts must be sufficiently "substantial and obvious" or "overwhelmingly clear or unambiguous" to put a respondent on notice that something is amiss. Matter of Driscoll, 447 Mass. at 685-686. See Matter of Zimmerman, 17 Mass. Att'y Discipline Rep. at 678 (forgery of client's former wife's signature was so obvious based on respondent's knowledge of couple's tenuous relationship and client's evasive behavior that board found respondent "steadfastly kept his eyes closed" to ensure transaction was successful).

Bar counsel argues that Foster's incompetence -- her failure to personally review Ballou's file, her failure to consult Kaczmarek and Ballou to determine what had been turned

over, her failure to ask more questions, and her failure to meet Ballou when he came to Boston with his file -- is evidence that she "closed her eyes to what was right in front of her," supporting a finding of willful blindness. We disagree. There is no evidence that supports the inference that Foster was purposefully avoiding familiarizing herself with the contents of Ballou's file or the larger set of evidence in Springfield by refusing to look. Further, as Foster suggests, unlike in Matter of Zimmerman, there was nothing about Kaczmarek's, Ravitz's, or Ballou's behavior to arouse suspicion that documents were being withheld. On the contrary, all three represented that everything had been disclosed. See Mass. R. Prof. C. 5.2 (b) comment 1 (fact that lawyer acts at direction of supervisor "may be relevant in determining whether a lawyer had the knowledge required to render conduct a violation of the [r]ules"). Bar counsel relies on the notion that it would have been easy for Foster to confirm whether everything had been turned over to the DAOs by "simply" reviewing the disclosure letters. While the ease of confirming the representations at issue is certainly part of the analysis of whether a respondent was willfully blind, it is not dispositive. See, e.g., Matter of Driscoll, 447 Mass. at 680, 685-686 (no willful blindness where respondent's secretary forged her husband's signature on loan documents despite that it would have been easy for respondent to

confirm legitimacy).  Because there is insufficient evidence that Foster knew the AGO had exculpatory evidence that had yet to be turned over, and was not willfully blind to this fact, we agree with the board that there was no rule 8.4 (c) violation.

ii.  <u>Mitigating factors</u>.  The SHO concluded that Foster violated rules 1.1, 1.2 (a), and 1.3 in connection with how she handled the responses to the Watt subpoena and the Rodriguez and Penate motions.  Specifically, the SHO found that Foster performed her role in an incompetent manner by failing to adequately prepare to respond to the motions, by failing to ensure that the AGO reviewed Ballou's file, and by failing to prepare Ballou for the hearings before Judge Kinder.  The SHO also concluded that, by making misleading statements in a letter to Judge Kinder with reckless disregard for their truth, Foster violated rules 1.1, 1.2 (a), 1.3, 8.4 (d), and 8.4 (h).  As a result, both the SHO and the board recommended a suspension of one year and one day.  Bar counsel supports the recommended suspension.  On appeal, Foster argues that a suspension is unwarranted and instead seeks a public reprimand.

A.  <u>Lack of experience as mitigating factor</u>.  Although she had been an attorney for five years, the board found Foster's lack of experience in having never responded to a subpoena before to mitigate some of her misconduct.  The board agreed, and bar counsel does not dispute that Foster's inexperience

should be considered in mitigation.  See Matter of the
Discipline of an Attorney, 448 Mass. at 834-835 (special
mitigating factors that respondent was new attorney in first
legal position, made misleading statements in negotiations, and
mishandled client funds at direction of employer); Admonition
No. 95-36, 11 Mass. Att'y Discipline Rep. 373, 375 (1995)
(mitigating factor that respondent lacked prior experience in
civil litigation and, specifically, in real estate).  We assign
minimal weight to this.  Foster's lack of experience in
responding to subpoenas does little to mitigate misconduct based
largely on her competence and diligence; more is expected of a
fifth-year attorney.

B.  Reliance as mitigating factor.[16]  Next, Foster contends
that her reliance on Ravitz and Kaczmarek is a "substantial"
mitigating factor under rule 5.2 (b).[17]  The SHO credited and

---

[16] Foster argues that her reliance on the instructions and
misrepresentations of Ravitz and Kaczmarek is a complete defense
to her rules violations pursuant to rule 5.2 (b).  This argument
is waived.  See Matter of Gannett, 489 Mass. 1007, 1009 (2022)
("Claims that were not raised before the hearing [officer] or
the board have been deemed waived").  Although Foster raised the
issue before the SHO, the SHO found that rule 5.2 (b) did not
apply, and Foster did not appeal that finding to the board:
"Foster is not asking the [b]oard to give [rule 5.2 (b)]
exculpatory effect."

[17] In her brief, Foster includes among the representations
on which she relied Ballou's testimony at the September 9
hearing.  Foster, however, does not argue that reliance on a
nonattorney client is mitigating.

considered as mitigating the fact that Foster's September 16 letter to Judge Kinder had been reviewed and approved by Ravitz. The SHO also found, regarding Foster's September 16 letter, that Foster's misconduct was further mitigated because Kaczmarek had misrepresented what had been disclosed to the DAOs and the nature of the evidence that had been found during the Farak investigation. The board declined to consider Foster's reliance on Ravitz's review or Kaczmarek's deception, however, reasoning that neither fact fell into the category of a special mitigating factor recognized by this court. Bar counsel concedes that a subordinate attorney's reliance on a supervising attorney may be considered a special mitigating factor in appropriate cases, as long as the reliance is reasonable and in good faith. Bar counsel maintains, however, that Foster's reliance on Ravitz does not meet this standard. We disagree.

Bar counsel has not pointed to any evidence in the record indicating that Foster relied on Ravitz's statements in bad faith. At a meeting on September 16, Ravitz told Foster that because everything had been turned over, there was nothing to produce, and directed Foster to draft her letter to Judge Kinder saying as much. Thereafter, Ravitz approved Foster's draft of the letter prior to Foster filing it.

Foster presumably requested Ravitz's review because he was her supervisor, this was an important matter, and she was a new

employee at the AGO who had no prior experience in responding to subpoenas. See Matter of Orfanello, 411 Mass. at 556 ("we may draw reasonable inferences from [the board's findings of fact] even if the board did not draw them"). As the SHO found, given Foster's status, and the importance of complying with Judge Kinder's order, it made "good sense" for her to have sought out Ravitz's approval.

Bar counsel cites Foster's failure to explain the distinction between Ballou's file and the evidence in Springfield at the September 10 meeting, which was attended by Ravitz, as evidence that Foster was acting in bad faith. We are unconvinced. This behavior is sufficiently explained by Foster's lack of diligence and competence and, therefore, is not evidence of an intent by Foster either to avoid her responsibilities or to mislead Ravitz and her colleagues.

Further, Foster's reliance on Ravitz's advice was reasonable. Ravitz was her direct supervisor, and he had worked at the AGO's office in the appeals division since 2004. See Matter of Newman, 31 Mass. Att'y Discipline Rep. at 483 (mitigating that attorney, in making false statements, relied on experienced appellate attorney). He also helped to train Foster in responding to subpoenas. See Matter of Galat, 18 Mass. Att'y Discipline Rep. 229, 237 (2002) (mitigating that junior attorney, who was not decision maker, relied on senior attorney

who had hired her, for guidance in using receivership funds). It was reasonable for Foster to assume that the information Ravitz provided her -- that everything had been turned over -- was correct.  Because Foster's reliance on Ravitz's instructions and approval of her September 16 letter was reasonable and in good faith, it may be considered in mitigation of her rules violations related to the filing of her September 16 letter.

Foster's reliance on Kaczmarek may also be considered in mitigation.  There were two misrepresentations by Kaczmarek on which Foster relied:  her e-mail message on September 10 and her statements in the September 10 meeting.  Both times, Kaczmarek detailed the contents of Ballou's file, and at the meeting, she represented that everything in Ballou's file had been turned over.  Similar to Verner's reliance, Foster's reliance on Kaczmarek was reasonable.  Bar counsel argues that we should not find mitigating a subordinate's reliance on a colleague who is not her direct supervisor.  We decline to limit our holding in this way.  A respondent's reliance on a colleague's false statements -- as long as the reliance is reasonable and in good faith -- has been and may be a special mitigating factor in certain circumstances.  See, e.g., Admonition No. 19-09, 35 Mass. Att'y Discipline Rep. at 700 (reliance on more experienced co-counsel, who was not respondent's supervisor, mitigating).

Although we conclude that Foster's reliance on Ravitz and

Kaczmarek is a mitigating factor, we assign less weight to Foster's reliance on Kaczmarek and Ravitz than we assigned to Verner's reliance on Kaczmarek. We do so for two reasons.

First, Foster was making affirmative representations in court filings, on which she signed her name. It should have been abundantly clear to Foster that it was her responsibility to verify the truth of her own representations. See Matter of Diviacchi, 475 Mass. 1013, 1020 (2016), quoting Mass. R. Prof. C. 3.3 comment 2, 426 Mass. 1383 (1998) ("[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry"). While the SHO found that Verner also should have verified the truth of Kaczmarek's representations, Verner did not adopt those representations as his own before a tribunal.

Second, Foster took the information Ravitz and Kaczmarek gave her and added her own "gloss" to it. The first statement in the letter, "After reviewing Sergeant Ballou's file," was not based on Kaczmarek's or Ravitz's statements; neither had indicated to Foster that Ballou's file had been reviewed. The SHO found that Foster's addition was reckless and misleading.

iii. <u>Aggravating factors</u>. The SHO found significant aggravating factors for Foster, including lack of candor, lack of remorse, lack of awareness of wrongdoing, great harm to and vulnerability of the victims, notoriety and harm to the public, and multiple instances of significant incompetence, lack of diligence, and repeated misrepresentations. Foster does not challenge all of the individual aggravating factors assigned to her, but we review them to determine the most appropriate sanction.[18]

Foster's lack of candor, lack of awareness of her wrongdoing, and lack of remorse before the SHO all weigh heavily in aggravation. See <u>Matter of Eisenhauer</u>, 426 Mass. 448, 456

---

[18] The SHO considered Foster's uncharged misconduct relating to statements she made at the October 2 hearing before Judge Kinder and her testimony before Judge Carey in 2016, finding, "Foster showed pervasive dishonesty across three tribunals." The board declined to consider Foster's uncharged misconduct from the October 2 hearing and the 2016 Judge Carey hearing in aggravation. While uncharged misconduct has been considered to be an aggravating factor in the past, see <u>Matter of Strauss</u>, 479 Mass. 294, 300 n.9 (2018) ("we have permitted uncharged misconduct to be considered in aggravation of sanction"), the board has recently cited a discomfort with doing so where bar counsel was in a position to raise the charge in the petition for discipline, but declined to do so, see <u>Matter of Parker</u>, 38 Mass. Att'y Discipline Rep. ___ , ___ (2022) (considering uncharged misconduct in aggravation "deprived the respondent of notice and an opportunity to defend against [the charges]"). As the petition for discipline was filed in 2019, bar counsel had the opportunity to charge her with misconduct relating to the events from 2013 and 2016, but chose not to do so. Thus, it was appropriate for the board to avoid considering Foster's conduct at these hearings as aggravating.

(1998), cert. denied sub nom. Eisenhauer v. Massachusetts Bar Counsel, 524 U.S. 919 (1998) (credibility, candor, remorse, and awareness of wrongdoing all relevant in deciding sanctions). The SHO found Foster's testimony before him to be "dissembling, disingenuous[], and evasive[]." Specifically, the SHO did not credit Foster's testimony that she was not trying to be intentionally vague in her September 16 letter, and described her answers to his questions about the September 16 letter as "disingenuous[]."

Another example of Foster's lack of candor before the SHO is her testimony about her prior work experience. On her resume that she submitted to the AGO, she indicated that she had substantial Superior Court experience, including "second-seating" homicide cases and drafting and arguing postconviction motions. Before the SHO, however, she claimed that she had no Superior Court experience. When questioned about the discrepancy, Foster refused to agree that she had embellished her prior experience and, instead, claimed disingenuously that she had a different understanding of the terms "drafting" and "arguing" when she compiled her resume. Foster's lack of candor was properly considered aggravating by the board, and we consider it here as well. Matter of Eisenhauer, 426 Mass. at 456 ("respondent's candor and trustworthiness both directly affect [her] capacity to practice law").

iv. <u>Foster's sanction</u>. Foster, like Verner, maintains that bar counsel failed to prove that her misconduct was the proximate cause of any of the harm that resulted. Foster's attempt to make this argument is no more persuasive than Verner's. Despite Foster's suggestion otherwise, the SHO found a causal connection between Foster's reckless misrepresentations and Judge Kinder's decision in the cases before him. Foster's representation that everything had been turned over led Judge Kinder to decline to grant new trials in the defendants' cases before him, because there was insufficient evidence that Farak had engaged in misconduct when the defendants had been arrested in 2011 or earlier. Moreover, when recommending a sanction of one year and one day, the SHO considered "the significant and far-reaching harm to the public and the insult to the legal system [Foster] <u>caused</u>."

As stated, each respondent's misconduct caused great harm, both to the criminal defendants whose cases were corrupted by Farak's tampering and to the public's perception of the criminal justice system. See, e.g., <u>Commonwealth</u> v. <u>Claudio</u>, 484 Mass. 203, 210 (2020) ("In [<u>Commonwealth</u> v. <u>Scott</u>, 467 Mass. 336, 352 (2014)], we recognized that Dookhan's misconduct 'cast a shadow over the entire criminal justice system.' In comparison, the government misconduct committed by Farak and members of the Attorney General's office cast a shadow even longer and

darker").  Accordingly, the board appropriately considered the extent of the harm caused by Foster, including the harm to vulnerable third parties, as aggravating.  See Matter of Zimmerman, 17 Mass. Att'y Discipline Rep. at 651 (harm to third party aggravating factor).  See also Matter of Crossen, 450 Mass. at 581 (vulnerability of third parties aggravating factor).

We adopt the board's recommendation of a suspension of one year and one day for Foster.  "When an attorney has engaged in misconduct 'involving repeated failures to act with reasonable diligence . . . and the lawyer's misconduct causes serious injury . . . to a client or others,' a suspension is warranted." Matter of Grayer, 483 Mass. at 1018, quoting Matter of Kane, 13 Mass. Att'y Discipline Rep. at 328.[19]  After considering the mitigating factors and the multiple significant aggravating factors, particularly Foster's lack of candor and her recklessness that led to extensive harm, we do not believe that this is markedly disparate from the sanctions imposed in other cases involving similar circumstances.  See Matter of Serpa, 30

---

[19] Foster argues that bar counsel only proved she engaged in "essentially negligent conduct."  As stated, Foster's conduct went beyond negligence; the SHO found that her conduct rose to a level of recklessness and gross incompetence.  And "reckless misrepresentation[s] to the court add[] weight to the . . . balance in determining the appropriate sanction."  Matter of Serpa, 30 Mass. Att'y Discipline Rep. at 370.

Mass. Att'y Discipline Rep. 358, 362, 372-373 (2014) (sixty-day suspension for violation of rules 1.5 [a], 3.3 [a], 8.4 [c], 8.4 [d], and 8.4 [h], absent certain aggravating factors, for "respondent's reckless misrepresentations [that were] particularly troublesome because they contaminated a process that . . . is likely to have had an impact on a person's liberty"); Matter of Scannell, 21 Mass. Att'y Discipline Rep. 580, 581-584 (2005) (suspension of one year and one day for neglect of three client matters in violation of rules 1.1, 1.2 [a], 1.3, and 1.4 aggravated by prior disciplinary history). See also Matter of Moore, 442 Mass. 285, 294-295 (2004) (fact that respondent failed to appreciate gravity of misconduct and lied to committee took case "beyond the short suspensions usually imposed" and for violations of [S.J.C. Rule 3:07, Canon 1,] DR 1-101 [A], DR 1-102 [A] [4], [5], and [6], [as appearing in 382 Mass. 769 (1981),] respondent received two-year suspension).

d. Kaczmarek. The SHO concluded that Kaczmarek, by failing to disclose to the DAOs potentially exculpatory evidence known to her, violated rules 1.1, 1.3, 3.4 (a), 3.4 (c), 3.8 (d), and 8.4 (d). The SHO also concluded that Kaczmarek, by knowingly failing to disclose potentially exculpatory evidence and by knowingly making materially misleading statements to assistant district attorneys Bossé and Flannery and State police

counsel Farrell, violated rules 1.1, 1.3, 3.4 (a), 3.4 (c), 3.8 (d), 4.1 (a), 8.4 (a), 8.4 (c), 8.4 (d), and 8.4 (h). Further, the SHO found that Kaczmarek, by failing to direct Ballou to provide Flannery with potentially exculpatory information known to her, violated rules 1.1, 1.3, 3.4 (a), 3.4 (c), 3.8 (d), 5.3 (b), 8.4 (a), 8.4 (d), and 8.4 (h). The SHO found that, by failing to take remedial action despite her awareness that Ballou had not disclosed potentially exculpatory information to Flannery, Kaczmarek violated rule 5.3 (c) (2). The SHO further concluded that Kaczmarek, by failing to undertake a review of her file and produce documents responsive to the subpoenas and discovery motions, and by failing to alert Foster to the existence of undisclosed documents, violated rules 1.1, 1.3, and 3.4 (c). Finally, the SHO found that, by failing, after reviewing the motion to clarify, to ensure potentially exculpatory information known to her that could be useful to Penate had been disclosed to the DAOs, Kaczmarek violated rules 1.1, 1.3, 3.4 (a), and 8.4 (d). As a result, the SHO recommended a two-year suspension for Kaczmarek. Reasoning that Kaczmarek bore the most responsibility for the AGO's failure to disclose exculpatory information, and that Kaczmarek was thereby the most culpable for the resulting harm, the board recommended disbarment. Bar counsel agrees with the board's recommendation; Kaczmarek appeals.

The only issue before us with respect to Kaczmarek is what sanction is most appropriate.  Kaczmarek argues that we should reject the board's recommendation of disbarment and instead impose a public reprimand or a two-year suspension.  Anything more than a two-year suspension, Kaczmarek argues, would be disproportional to her misconduct.[20]

i. <u>Aggravating factors</u>.  The SHO and the board did not find any factors in mitigation for Kaczmarek.  Conversely, the SHO found, and the board adopted, a litany of factors in aggravation.  These included Kaczmarek's experience; her lack of remorse, lack of admission of wrongdoing, and her failure to show appreciation for her role in what occurred; her lack of candor; her multiple rules violations; her improper motivation for her misconduct; and the significant harm to third-party defendants, the criminal justice system, and the public.

---

[20] In support of her argument, Kaczmarek maintains that at the time of her misconduct, no disciplinary rule imposed an obligation on a prosecutor to disclose evidence from a pending criminal case to third persons.  She alleges that, if she were to be disbarred, the court would be engaging in a "retroactive" application of rule 3.8 (d).  In making this claim, Kaczmarek attempts to seek review of the SHO's finding that she violated 3.8 (d) by cloaking her argument as one that affects her sanction.  As this argument is not properly before the court, we do not address it.  We note, however, that the only way the Farak defendants could have accessed the exculpatory evidence was through the AGO; it acted as a gatekeeper to the information.  The AGO was the only entity that possessed the mental health worksheets and the 2005 cocaine case, both of which "tend[ed] to negate the guilt of the accused or mitigate[] the offense."  See Mass. R. Prof. C. 3.8 (d).

Kaczmarek challenges some, but not all, of the factors considered by the board, arguing that the board "ignore[d] the nuances that distinguish this matter."

First, Kaczmarek argues that the board improperly considered the number of rules violations in aggravation because she committed only three acts of misconduct:  (1) failing to disclose potentially exculpatory information to the DAOs; (2) misleading Bossé by telling him that "all relevant discovery had been provided"; and (3) misleading Farrell when he inquired about Ryan's subpoena for documents.  This, however, understates Kaczmarek's misconduct.  We are not persuaded that Kaczmarek's misconduct can be characterized as three discrete instances; it is "neither possible nor logical to isolate each distinct instance of wrongdoing.  They infect each other."  Matter of Hayes, 39 Mass. Att'y Discipline Rep.    (2023) (respondents' multiple rules violations considered in aggravation).  Kaczmarek's deceit was protracted.  See Matter of Griffith, 440 Mass. at 510 ("the length of time the respondent permitted his [or her] concealment of information to stand" may be aggravating factor).  She "actively and intentionally" misled assistant district attorneys and her colleagues at the AGO, failed to correct Ballou's inaccurate and misleading statements, and avoided learning anything more about the extent of Farak's misconduct over the course of her involvement in the Farak

investigation. It was appropriate for the board and the SHO to consider Kaczmarek's multiple rules violations as aggravating. See Matter of Saab, 406 Mass. 315, 326-327 (1989) ("consideration of the cumulative effect of several violations is proper").

Kaczmarek next argues that the board erred in considering her improper motive. The board found that Kaczmarek's primary motivation was to contain the damage of Farak's misconduct to a few cases in order to avoid further complications. Kaczmarek maintains that this characterization of her motivation is not supported by substantial evidence. We agree with Kaczmarek that there was not substantial evidence that her intentional misrepresentations were motivated by a desire to downplay the extent of Farak's misconduct. The SHO found, however, that Kaczmarek's "disturbing attitude" toward defense counsel evidenced an improper motive. Kaczmarek was wholly uncooperative and dismissive of Ryan's appropriate discovery requests. She obstructed defense attorneys' access to important exculpatory evidence. Indeed, Kaczmarek conceded at the hearing before the SHO that she was "annoyed" that Ryan continued to ask for access to evidence in the Farak case: "it's probably the 90th time he asked if he could see the evidence in the lab."

An attorney's motive can be relevant in determining the proper sanction. See Massachusetts Bar Discipline, supra

at 403.  The SHO properly considered this factor in aggravation, and we assign it some weight in our determination of her sanction.  See Matter of Finneran, 455 Mass. at 736 (improper motive constitutes aggravation); Matter of the Disciplinary Proceeding Against Schafer, 149 Wash. 2d 148, 170 (2003) (lawyer who violated client confidences and was partly motivated by vindictiveness found to have met standard for having selfish motive).

Kaczmarek also takes issue with the board's consideration of her experience as an aggravating factor.  Specifically, Kaczmarek argues that "her experience disclosing exculpatory evidence to the defendant she was prosecuting did not provide her with knowledge of how to handle disclosure to others."  We are wholly unconvinced that Kaczmarek's experience as an attorney for thirteen years, her experience both as an assistant district attorney and in private practice, and her eight-year long tenure at the AGO did not provide her with the knowledge of how to handle disclosures to others.  Even more significant was Kaczmarek's work on the Dookhan case.  By the time Kaczmarek was assigned to the Farak prosecution, she had already possessed an intimate familiarity with the AGO's discovery policy adopted in the case, because it was the same policy that she had used in the Dookhan case.  Kaczmarek's experience is properly considered

aggravating.  See <u>Matter of Moran</u>, 479 Mass. at 1022; <u>Matter of Luongo</u>, 416 Mass. 308, 312 (1993).

In further aggravation, Kaczmarek exhibited a lack of candor before the SHO; Kaczmarek's testimony was characterized as "vague" and "dissembling."  See <u>Matter of Zankowski</u>, 487 Mass. 140, 153 (2021) ("While an attorney is entitled to defend against allegations of a petition for discipline, the hearing [officer] may determine whether to credit the testimony and evidence, and [the officer] may consider in aggravation any lack of candor [he or she] finds").  Indeed, the SHO found a remarkable number of instances in which Kaczmarek's testimony was not credible:  her failure to realize that the 2012 oxycodone case and the 2005 light cocaine case were potentially exculpatory; her claim that she had no reason to review, and her failure to review, the prosecution memorandum once Verner returned it to her; her assertion that it was not her job to identify and disclose exculpatory evidence to the DAOs for the benefit of the Farak defendants; her claim that her September 10 e-mail message listing the mental health worksheets triggered nothing in her mind; and her denial that the meeting on September 10 with Foster, Verner, Reardon, Ravitz, and Mazzone had occurred, wherein she informed everyone that everything in Ballou's file had been turned over.  The SHO found, on the basis of these falsehoods, that Kaczmarek's testimony was not candid.

Kaczmarek's striking lack of truthfulness is deeply troublesome with respect to her capacity to practice law. See Matter of Eisenhauer, 426 Mass. at 456.

Moreover, Kaczmarek misled Verner, Foster, and other colleagues about what had been disclosed to the DAOs, something the SHO labeled as "particularly disturbing" in an office where colleagues must be able to rely on each other for accurate information. We consider this, too, as aggravating. See Matter of Ferris, 9 Mass. Att'y Discipline Rep. 110, 112 (1993) ("In aggravation, the committee found that . . . the respondent intentionally misled his clients for his own gain"); Massachusetts Bar Discipline, supra at 406 ("the extent of an attorney's . . . manipulation in the course of the misconduct" may be aggravating factor).

Additionally, the SHO found that Kaczmarek displayed no remorse, admitted no wrongdoing, and showed no appreciation for her role in what occurred. As it was with Foster, this was properly considered by the board as aggravating. See Eisenhauer, 426 Mass. at 456.

Finally, the board assigned weight to the gravity of the harm and to the fact that Kaczmarek's intentional misconduct directly caused this harm. Kaczmarek argues that the harm caused by the AGO's failure to disclose exculpatory information cannot be solely attributable to her because institutional

failures and Farak's own misconduct were also contributing causes. As discussed supra, each of the respondents played a role in causing the harm. Accordingly, we do not find Kaczmarek solely responsible. We do conclude, however, as the SHO did, that she bears the greatest responsibility, as well as the greatest culpability. Kaczmarek "knowingly failed" to produce exculpatory evidence and made "materially false and intentionally misleading" statements to the DAOs and to her colleagues that all relevant discovery had been turned over. See Matter of Pike, 408 Mass. 740, 741 (1990) ("intentional abdication of . . . professional obligations" may warrant more severe sanction).

Kaczmarek further maintains that the record contains evidence of only thirteen convicted defendants, not thousands, who were party to the consolidated case before Judge Kinder and who were affected by their inability to access the mental health worksheets and exculpatory evidence. We reject this characterization of the harm for reasons we have already discussed.

ii. Kaczmarek's sanction. To start, as noted by the board, although they are not entirely unprecedented, there are few disciplinary cases in Massachusetts against prosecutors. See Matter of Dunne, 36 Mass. Att'y Discipline Rep. 143, 144 (2020) (in reciprocal discipline case, one-year suspension for

prosecutor's misrepresentation to court and opposing counsel that she did not possess tape recording of defendant's conversations with his son, in violation of Fla. R. Prof. C. 3.3, 4.1, and 8.4 [d]); Matter of Marshard, 34 Mass. Att'y Discipline Rep. 283, 286, 295 (2018) (one-month suspension for prosecutor's meeting with represented witness without witness's attorney, in violation of rules 4.2 and 8.4 [d], aggravated by experience, lack of understanding of ethical obligations, lack of candor, and misrepresentations to judge).  In reviewing these cases, we have come across none that is comparable to the facts we have here.  Although we consider whether the recommended sanction is "markedly disparate from judgments in comparable cases," see Matter of McBride, 449 Mass. at 163, when there are no comparable cases,

> "[w]e . . . must establish independently a sanction
> adequate to address the seriousness of the misconduct, to
> reassure the bar and the public that such conduct is
> completely contrary to the oath of office taken by every
> lawyer, and to underscore that, when it is uncovered, such
> conduct will be treated with the utmost severity."

Matter of Foley, 439 Mass. at 339.

In determining what sanction to assign, "the primary factor . . . is 'the effect upon, and perception of, the public and the bar.'"  Matter of Zak, 476 Mass. at 1041, quoting Matter of Finnerty, 418 Mass. 821, 829 (2008).  Our rules of professional conduct "[e]xist to protect the public and maintain its

confidence in the integrity of the bar and the fairness and impartiality of our legal system."  Matter of Zak, supra at 1038.

As a result of Kaczmarek's intentional and egregious misconduct, the due process rights of thousands of criminal defendants were violated for a prolonged period based on the withholding of exculpatory evidence.  Kaczmarek failed in her duties as a prosecutor by knowingly impeding access to evidence and information.  She made materially false and misleading statements to the DAOs and her colleagues.  Due to the gravity of the harm, the multitude of serious aggravating factors, and the lack of any mitigating factors, we adopt the board's recommendation of disbarment for Kaczmarek.

4.  Conclusion.  For the reasons stated, we adopt the board's recommendations of a suspension of one year and one day for Foster and disbarment for Kaczmarek.  For Verner, we conclude that a public reprimand is appropriate.  We remand to the county court where a judgment consistent with this decision shall enter.

So ordered.